I'm Matthew Dietz from Disability Independence Group. I'm here with my co-counsel Lisa Goodman and we represent Harold Crane. This case is the eighth in a series of cases in which this death in medical environs. This case is a case in which Mr. Crane, who was Baker-acted into a psychiatric facility, was not provided with an interpreter. And there are two issues. And these are two issues that have been recently resolved both in the Silva case and the Sunderland case, which were both in front of the court. The first issue is whether or not effective communication was provided. The standard for effective communication should be whether the death period... Let me ask you a question at the outset. It wasn't really triggered by the briefs here, but it's something we're required to look at anyway. And that is constitutional standing, Article III standing to seek injunctive relief based on the ADA and the 504 claims. We're obliged to always inquire about our standing here. What reason is there to believe that the question is sufficiently concrete and immediate for us to address it now? Is there a real and an immediate likelihood, one, that your client will go back to that hospital if he has a problem? And two, if he does go back to that hospital, is there a real and an immediate likelihood that the hospital will deny him an ASC interpreter on demand in the future? And if it's wholly unclear and speculative, I'm not sure that this case is justiciable at this time. You understand the issues that I'm raising? I understand fully, Judge Marcus, and that's an issue that this Court has addressed in every single appeal involving people in a hospital. And to frame just the, I don't want to waste too much time on the issue, but to frame what triggered it in my own mind is that when you looked at what your client said, he says two things. At one point he says, I'm not going back to that hospital. Not that he didn't expect that he might not be hospitalized, and there's certainly plenty to suggest that he might be. But he says, I'm not going back to Palmetto General, in which case it really does look rather speculative. On another hand, at another point he says, yeah, I would go back there, presumably to test the proposition of whether they would give him an interpreter. Why is this case alive, immediate, concrete, something we should grapple with now? Your Honor, as we speak, Mr. Crane is at the hospital, and he was Baker Acted last night. That's why he's not here today. I can't imagine that it cannot be more concrete than that. At which hospital? Palmetto. So he went back to Palmetto. Correct. He was taken by ambulance there yesterday. Okay. Do we judge standing from what you tell has happened yesterday, amazingly, before the district court had the lawsuit before it? Well, the district court ruled that there was standing because . . . I know, but we're reviewing that decision. Is that when standing counts? No, standing counts at any time throughout the proceeding. Standing can be lost during the pendency of the appeal. So you would not look at . . . It can be lost, but can it be gained? No, it cannot be gained. However, the judge made the determination of the likelihood that any other similar cases have ruled that there was standing. That's the first time he's had mental health treatment at a hospital in five and a half to six years? No, he's had frequent mental health issues. Now, as I understand the record, he's been in . . . up until the time he went in the case that went to Judge Cook, he was in nine times for alcoholism. This would be the tenth? Oh, no. He's been several times. He has frequent mental issues and mental problems and alcoholism as well. He lives with mental illness. Let me ask you this. Dr. Williams said that he had delusional disorder, persecutory type, bizarre content, unspecified severe, and all that kind of stuff. Is this a situation in which he should have a guardian ad litem? No. Well, that was one thing that we wanted in the inception of the case, and our motion to appoint a guardian ad litem for Mr. Klain was denied. That's something that we tried because of his mental illness, but the court felt, and we didn't believe that it was abusive discretion that a guardian should not be granted for purposes of this matter. You think it was an abusive discretion? No, I don't. I don't. It's my personal belief that as long as somebody maintains some ability to do things, it's a drastic move to take any rights away from any human. I thought you were somebody representing him asked to take the rights away from any human early in the lawsuit. Yes, we did for purposes of, because Mr. Klain does have significant mental issues, we did, but I don't believe that the court abused its discretion, and I don't believe that we met the standard. That's why it's not subject on appeal today. We took you away from your focus. You're welcome to focus again if you'd like. Oh, sure. Your Honor, when I did the reply brief on this case, I said that this was identical to the Silva and the Sunderland case, and it's also identical to the Lease case that Judge Carnes had. The standard involved in the case was, the standard involved for effective communication is whether or not the deaf person has the ability to communicate medically relevant information. That's what effective communication is. In this case, Judge Clark did the same thing that Judge Williams did in the Silva case. Context is critical, as we said in Lease. Yes. It's one thing before doing emergency surgery to explicate the what, the wherefore, and why so that a patient can make an informed choice. Baker Act examinations, though, strike me as somewhat different. There are serious and substantial consequences, but do they require the same kind of complex communications? The statute itself contemplates a relatively quick examination and determination. What significance are we to draw from the difference between a Baker Act examination, which is short, quick, and answering an immediate question rather than providing remedial relief? Is the person a substantial danger to himself or to others, which is a different question of how do we remediate what might be a serious psychiatric problem? Is the context here sufficiently different so that the result might be different in terms of what you have to provide for communication? The context here is more severe. In a Baker Act, you're dealing with a person's Fourteenth Amendment rights, first of all, but second of all, you're not only dealing with the examination, you're dealing with the treatment or the potential treatment. Entire treatment as compared to an operative procedure is something in which you're going to do, whether you explain it or not, but you can't tell whether a person is a threat to themselves from the one page of notes that was provided that the court relied on to make its determination that the minimum standards were met. In this case, it's not the minimum standards. It's the fact that he went there for treatment, and then he had to check himself into another facility for 20 days in order to get the treatment that he did not need. No, but he doesn't go to that institution for treatment. He's brought there, inebriated, where there was a demonstrable fear that maybe he would kill himself or harm someone else because he had threatened suicide or whatever. So he didn't go there on his own steam, right? There's that difference, but the Baker Act procedure itself, isn't it distinct from the kind of procedures and the needs to communicate that might be associated with surgery? It is different, and the rights in your Baker Act are spelled out by Section 394, 459, and they are more important, and the communication is essential because your communication in your Baker Act is what the treatment is. It's not you're being sliced down the stomach for an appendicitis. But isn't your more important point that it doesn't matter whether he gets the correct diagnosis and the correct treatment? The focus is solely upon whether he can communicate effectively about that as effectively as auxiliary aids allow him to, approaching that somebody who can hear. Yes. I mean, that's what we held in Sylva, wasn't it? Yes, exactly what he held in Sylva. So regardless of what the issues are in the diagnosis and treatment, the question is whether he can talk to the doctors about it along the way. In the same way as an able-bodied person can. Or as close to the same way as auxiliary aids will enable him to. Some folks, there are no auxiliary aids that will bring them up to that level. Exactly, Your Honor. I see my time is up. I did not address anything about deliberate indifference. Does the Court want to address that? We ask you a bunch of questions. If you want to take a couple extra minutes to address something else, you're welcome to do so. I'm not implying you need to do so. It's just I don't want to ask you about our concerns and not allow you an opportunity to address other matters if you'd like. The only matter I'd like to address is deliberate indifference because that's a matter that has gotten a lot of discussion with regards to the animus that some courts in the Eleventh Circuit say that it requires. What the Chief Judge said in McCollum, which did not go for the plaintiff in that case, but the only standard that needs to be established for deliberate indifference was that there was a substantial likelihood that they would be unable to communicate effectively with a person absent an interpreter but made the deliberate choice not to. This has been a standard that there's been a lot of controversy in the Eleventh Circuit whether or not there needs to be animus. In this case, the court specifically stated that there was no disrespect. Disrespect is not an issue that has ever been involved in anything involving disability discrimination and Alexander v. Choate. If this court is going to go into deliberate indifference and what includes deliberate indifference, it's important that the standard is clear and does not require any deliberate animus involved in the discrimination. Thank you very much for your time today, Your Honors. Thank you, Counsel. You'll have your full reply time of five minutes. Mr. Goldberg. Yes, Your Honor. May it please the Court. Martin Goldberg along with my partner, Laurel Aynvand-Wye, on behalf of the Palmetto entities. If I may, I want to start this morning and address and conflate the two questions that you, Judge Marcus, and you, Judge Carnes, raised about, one, the Baker Act and effective communication within the Baker Act. Because I think on this record, there's been a failure to adduce evidence by Mr. Crane that there were any barriers or a quote-unquote real hindrance as enunciated by Silva within the context of the Baker Act as to his ability to communicate. And I point you to, number one, Judge Marcus's question that the Baker Act is very different. It's an evaluation. And it's an evaluation just focused not on diagnosis, not on treatment, we're not talking about it . . . Right. But the essential point is the capacity to communicate. And I want to ask you in that respect, when I looked at Dr. Caro's July 20th report, I just want to quote from it, and it's what troubles me, if you could address it for me. Dr. Caro writes, quote, we have been spending time trying to explain to Crane, first by writing and communication, going back and forth, explaining the situation of the Baker Act. Since he was not able to understand the whole process, we were able to get an interpreter with the name Stacy, was very helpful to communicate with him. He was feeling overwhelmed, frustrated, et cetera. But here is the evaluating psychiatrist telling us in her report, one, that he was having trouble understanding the nature of the Baker Act and its process itself, which is, you know, compelled institutionalization. And since he was unable to understand the process, they felt the need to get an interpreter, which they did by his lights a day late and a dollar short, because it came at the back end of the procedure. But doesn't that, at a bare minimum, suggest at least a material question of fact and dispute? Absolutely not. And let me answer it in more detail. You go back, we got it started on July 18th when he had the initial evaluation by Dr. Caro. And she testified, and it's in the July 18th note, that that was the Baker Act evaluation. And that she did that without an interpreter, but was able to communicate effectively and got all the information that she needed from a . . . You're looking at it from her sucking out information as opposed to her flowing in information. But within the context, she was asked a deposition, the exact point that Judge Marcus is raising. When you say he was frustrated and so forth, she said, number one, he was frustrated by his lack of understanding as to how he wound up at the hospital, how the police were able to take him there. He didn't understand the Baker Act. Right. But what she says by way of explanation, post hoc in a deposition, is arguably a different spin or twist on this. Because what she says in her written report, which was closest to the time in question, was that he was not able to understand the whole process relating to the Baker Act. And therefore, they got him an interpreter. And Stacy was very helpful. She explains it a way, of a fashion. But isn't there a fact question and dispute? These words suggest he was having trouble understanding and he was having trouble communicating. And we know that he had asked four times for an interpreter, if I have that right. Why couldn't a jury discard her post hoc explanation in the deposition and draw an inference from these words which she wrote at that time? And say, he couldn't effectively communicate, he didn't understand the process, and he needed an interpreter. Why couldn't a jury draw that from the statement that appears in Caro's July 20 report? Because I don't think it gets to a jury. Because getting right to the point, from our perspective, that is not medically relevant information for a Baker Act evaluation. You keep looking at it in terms of what's necessary to diagnose. We said in a published binding precedent in Silva, that's not the sole focus. You've also got to look at it from the patient's perspective. And I thought Dr. Caro also said, maybe not after she had lawyered up, so to speak, but she also said along the way, and the jury could credit, that they needed an interpreter to explain his medications to him. Am I wrong about that? I think that, I think she said... Could a jury find it, that that's what she said, early on? I don't believe that that's what she said. She did say, at one part of her deposition, that she believed that the interpreter wasn't necessary, but, and I know it's from her perspective, she thought it could help more for because his lack of understanding of the Baker Act. But I have to go back and just highlight... He has a right, under the ADA and the Rehab Act, of being able to understand to the maximum extent possible, with auxiliary aids, the Baker Act. Does he not? I thought the whole standard that we had enshrined in our case law was, you've got to use auxiliary aids so that the patient, who in this case is disabled without hearing, can understand to the maximum extent possible, through those auxiliary aids, the same thing that a patient could understand. And I go back to... I'm sorry, a non-disabled patient. I understand. He was provided with an interpreter to explain that issue. I thought the interpreter signed only. All the interpreter signed was, okay, get your clothes on, you're ready. That is a different issue. He said, that was... At first he said there was no interpreter. First he says, I have no memory of being there. Then he says there was no interpreter at all. Then when he refreshed the recollection, he still said, no way. Then he then said in deposition, well, all the interpreter said was, get your clothes on. And a jury could credit that last recounting, could the jury not? I don't think so. Under your case law, Ward versus AT&T, I don't think it's... I think it's inherently implausible and it's flatly contradicted by the evidence. If you look at the nurse's note, the interpreter was there from 9 to 11 o'clock. We don't go with implausible in other people's notes. What we go through is, is it scientifically impossible for the story that favors the non-moving party to be true, then you don't have to believe it. Supreme Court has appended to that. If there's a videotape, you don't have to believe the story contrary to the videotape. We don't have a videotape and it's not scientifically impossible for the interpreter to have simply said, okay, get your clothes on, you're ready, through sign language. I suggest that there's a record in the... There's a piece of evidence in the record that it's the invoice from the interpreting service who flatly says, I was there from 9 to 11, 24. So why does the jury have to believe the invoice behind which there is a strong pecuniary motive as opposed to the plaintiff's statement behind which there's also a pecuniary motive? Why can't the jury pick one or the other after hearing the testimony at trial? I believe that his statements are flatly contradicted by the evidence on that point. That doesn't matter, does it? Suppose there were three bishops and two, only have one pope, three bishops and one pope swearing to that. We've still held he's entitled to a jury trial. The other point I want to raise, I understand if the notes and you're going to credit his position... No, no. We don't have to credit it. We have to say that a reasonable jury could credit it. And my point overall on this record is that under the ADA, the hospital gave a combination of auxiliary aids that did not act as a barrier to his ability to communicate. Even assuming, Arguendo, that you're right, that the record unambiguously establishes that an interpreter was available at the very end of the process when he was checking out, does that answer the whole question? If he didn't get an interpreter when she was involved in the diagnostics and working it and reaching the determination, there was no interpreter when the two of them communicated before the 20th. After all, he's brought in there on the 18th, the examination occurs on the 19th, and then he's discharged on the 20th. He asked for an interpreter on multiple occasions. And the claim is he could not effectively communicate what was essential to the psychiatrist. He didn't understand the nature of the proceeding itself. So even if he had one for two hours, even if we accept that, does that answer the entire question? No, but... Or don't you have to also establish that there's no material fact in dispute about whether or not he was able to effectively communicate with other auxiliary methods and aids without the ACL interpreter on the 19th when he and the psychiatrist have this lengthy discussion? They did. They had a lengthy discussion. And from Chief Judge Carnes' instruction, let's look at it from Mr. Crane's perspective. The only evidence he put into the record... The shrink was there, and he was there, and the interpreter was there for two hours, right? You still could lose. There still could be a jury question. On this record, I don't think there is. And I go back to... No, but what happened on the 20th is not dispositive is all I'm asking you. Yeah. I agree. You would agree with that? Yes, I do. Okay. But if you look at independently what happened on the 18th when they had that long discussion, and Dr. Caro explains the framework that she is not... She's there for the here and now. She's not to resolve the problem of what led the individual to the hospital, and she's busy... Let's stop at that point. You say she didn't have to inquire about what led him to the hospital. The Baker Act is designed to protect someone about whom there's a substantial reason to believe they will harm themselves or others, seriously harm themselves or others. It's an involuntary institutionalization. It's a very serious process. The psychiatrist says, I, then they can go to court later and challenge it. But for some fixed period of time, someone is being locked up, basically. So it's a big deal, even if the process is a different process. It's a big deal to everybody involved in the case. Why couldn't... I want to come back to it. On this record, a jury put credence in Caro's July 20 report and discount her subsequent deposition explanation and conclude from that that he had established by a preponderance of the evidence that he was entitled, in order to be able to effectively communicate here to an ACL sign language interpreter. Let me answer it in two parts. On July 18th, when she had the evaluation, a lack of his purported lack of understanding of the Baker Act process and why he was brought there from the police is not medically relevant under SOBA. And Dr. Caro makes that clear. It wasn't part, needed part of her evaluation. Don't you have to know, in order to evaluate whether or not, from a psychiatric standpoint, he poses a substantial risk of danger to himself or others, you've got to make some kind of inquiry about suicidal ideations, what brought him there. You need some understanding about what happened here. It may be different from what you need to evaluate how to treat, but how do you get to first base and make that determination without inquiring of the patient? If you look at her July 18th note, she has a long discussion about all the elements of a Baker Act, observing him, talking about his brief psychiatric history. She spent more than an hour with him when she normally spends 30 to 45 minutes. She unequivocally gave him more time, based on this record, than other hearing patients. And I have to highlight again, and just let me focus on this, as to the issue of his... You know, I'm not disputing that she did the best she could under the circumstances. The problem was that there was some difficulty in communication, at least arguably. Which was rectified and addressed when she got the interpreter on the 20th, but it did not hinder his ability to communicate medically necessary information for the Baker Act evaluation that occurred on the 18th. And that, it is unrefuted in the record. Even if you look at the only thing that Mr. Crane put in the record about his wanting to communicate what he believed was medically necessary information is his declaration filed to oppose summary judgment, paragraph 14, where he says, I want to tell more details and more thoroughly about sexual dysfunction, the loss of my mother because I couldn't find her body for 20 years, and so forth. And at deposition, which is unrefuted, Dr. Caro said, those issues are not what I'm here to address. There's no expert testimony on the other side. They only took one deposition of a corporate rep prior to Dr. Caro. It's unrefuted that that attempt to suggest it was medically relevant information fails. The best they've done is they have an amicus brief that swipes at Dr. Caro, but an amicus brief isn't evidence for what she should or should not have seen. And so I go back and I see my time's up, but I'll close with the issue and frustration that he experienced with respect to not understanding the Baker Act. She said it applies to everybody, but it wasn't medically relevant information that was necessary for the evaluation under SOBA, and that's why I think summary judgment should be affirmed. Let me ask you this. Was the term qualified immunity ever mentioned in the district court? Not that I recall. You got a claim for compensatory damages against these folks. I guess they weren't government actors. Is that the deal? Are you talking about who? I'm sorry. I thought that there were a claim for compensatory damages not just against the hospital, but against some of the individuals. No. The only claims in this case were against the hospital and then one level up, a corporate entity above the hospital. That explains it. Thank you. Thank you. Thank you for your time. Your Honors, I'd like to address just a few points. The first point is the context, the issue of medically relevance. The lower court did not credit Dr. Caro's testimony. The lower court just said on the face of the notes that was all that was needed in order to do a Baker Act evaluation. Anything that was stated about what Dr. Caro did or Dr. Caro didn't do, the district court acknowledged that there was disputed fact. I think the one issue that illustrates the difference in communication and what we're talking about here is not medically relevance testimony. We're talking about the programs and services offered by the hospital in dealing with this. Dr. Caro's deposition, and this is on page 21 of her deposition, which is DE 95-1, she goes and she states that this isn't a brief consultation. These are all of the questions that I asked. She goes in detail about all of the questions and all of the information that she asked, which counsel is saying that isn't medically relevant. Now, the question is not whether or not something is medically relevant. It's whether somebody's treated the same. That's the essence of discrimination in this case and the essence of discrimination in any other case. Now, the thing to compare page 21 to 23 with is the document which the court relied on to say that this was sufficient medically relevant evidence, which was on 67-1, which was in the appendix as tab B. That is not close to how other able-bodied hearing people are treated. The last point I'd like to address is what Judge Marcus said was too little too late. There's several cases that say if an interpreter was presented at the end, there's no deliberate indifference, but what we have to look at is we have to look at all the programs and services of the entity. It's similar to say that we could have a movie or a play and we couldn't get an interpreter for every ... Your colleague conceded in the course of our discussion that even assuming arguendo, the interpreter is available for two hours between 9 and 11 on the last day, it doesn't dispose of the claim that he was entitled to or may have been entitled to an interpreter earlier in the course of the colloquy between Dr. Caro and the patient. And that is ... So that it doesn't really fully answer the question, but it seems pretty relevant. It is, but what I'm saying is the step beyond that is does that say that that is a deliberate indifference? And a lot of the issues that come up in these cases is whether or not an accommodation is finally provided at the end, is that still deliberate indifference? And my position is yes, because he would not have been there. Right, but the pivotal point is if you're right about there being a material fact and dispute about the first issue, then deliberate indifference becomes an easy question and it would go to a jury. If you're wrong about the first issue, then it seems to me you're wrong about the second. So isn't the essential question for us issue one? If you win on that, you win on the other. If you lose on that, you lose on the other. Absolutely. Don't you agree with that? Indubitably, yes. However, courts have held for summary judgment to say as long as something was provided, as long as they had something, as long as they have some policy out there, then you can have deliberate indifference. I agree with this court in saying that if you say yes on one, it is a question on two. It doesn't foreclose to and saying as long as they provided something, it's indicative of deliberate indifference. I mean, it's indicative of saying that it's not deliberate indifference and that's what my concern is with this case and my concern is with this line of law that's come down from the eight cases that this court has had previously. Well, to the extent our case laws support that proposition, we can't overturn it. When you say some cases to the extent their holdings against you in previous panel published decisions, we, like you, have to take those as a given at this stage. What I'm saying is it's not the panel decisions, it's how these panel decisions are interpreted. By? By district courts. Thank you very much for your time, Your Honors. Thank you. All right, next case up is Haynes v. Hooters.